UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IRIS R. REDWINE                                           CIVIL ACTION

VERSUS                                                    NO. 12-2269

MICHAEL J. ASTRUE, COMMISSIONER                           SECTION "R" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Iris R. Redwine, seeks judicial review pursuant to Section 405(g) of the

Social Security Act (the "Act") of the final decision of the Commissioner of the Social

Security Administration (the "Commissioner"), denying plaintiff's claim for disability

insurance benefits ("DIB") under Title II of the Act.  42 U.S.C. §§ 405(g), 423.  This

matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)

and Local Rule 73.2(B).

Plaintiff filed a motion for summary judgment and brief in support of her appeal.

Record Doc. No. 14.  Defendant filed a timely reply memorandum of facts and law.

Record Doc. No. 15.

I.     PROCEDURAL HISTORY

Redwine filed an application for DIB on July 16, 2010, alleging disability since

December 1, 2008, due to depression, hepatitis C, anxiety, panic attacks and migraines.

(Tr. 77, 145, 150, 180).  Her date last insured for benefits was December 31, 2013.  After

her application was denied, plaintiff requested a hearing before an Administrative Law

Judge ("ALJ"), which was held on August 11, 2011.  (Tr. 36-74).  On September 21,

2011, the ALJ issued a decision denying plaintiff's application for benefits.  (Tr. 21-31).

After the Appeals Council denied review on July 19, 2012, the ALJ's decision became

the final decision of the Commissioner for purposes of this court's review.  (Tr. 1-3).

II.     STATEMENT OF ISSUES ON APPEAL

        Plaintiff contends that the ALJ made the following errors:

        A.      The ALJ erred by failing to include in her residual functional capacity
                findings certain limitations from the medical opinions to which she
                accorded substantial weight.

        B.      The ALJ erred by rejecting the findings of plaintiff's treating psychiatrist.

III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

        The ALJ made the following relevant findings:

        1.      Redwine has not engaged in substantial gainful activity since December 1,
                2008, the alleged onset date.

        2.      She has severe impairments of personality disorder and affective disorder.

        3.      Plaintiff does not have an impairment or combination of impairments that
                meets or medically equals the severity of one of the listed impairments in
                20 C.F.R. Part 4, Subpart P, Appendix 1, including specifically
                Listings 12.04 for affective disorders, 12.08 for personality disorders and
                12.09 for substance addiction disorders.

        4.      She has mild restriction in her activities of daily living; moderate
                difficulties in social functioning and in concentration, persistence and pace;
                and no episodes of decompensation of extended duration.

        5.      Redwine has the residual functional capacity to perform the full range of
                light work at all exertional levels, with the following non-exertional

limitations:  she can follow simple, repetitive instructions of unskilled nature, she can seldom have contact with the general public, she cannot engage in team work, and her assigned work must be low stress, i.e., no production work.

6.     Although her medically determinable impairments could have been reasonably expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

7.     She is unable to perform any of her past relevant work as a cashier, janitorial services manager, laundry presser, laundry attendant or candy packer.

8.     Based on plaintiff's age, education, work experience and residual functional capacity, jobs exist in significant numbers in the national economy that she can perform, such as dishwasher, maid or housekeeping cleaner, and tube operator.

9.     Redwine has not been under a disability at any time from December 1, 2008 through the date of the decision.

(Tr. 23-31).

IV.   ANALYSIS

A.   Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d

3

378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations

4

that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§

404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2009).  The regulations

include a five-step evaluation process for determining whether an impairment prevents

a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920;

Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1]  The five-step

inquiry terminates if the Commissioner finds at any step that the claimant is or is not

disabled.  Perez, 415 F.3d at 461.

    The claimant has the burden of proof under the first four parts of the inquiry.  If

she successfully carries this burden, the burden shifts to the Commissioner to show that

other substantial gainful employment is available in the national economy that the

---

[1]The five-step analysis requires consideration of the following:

    First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

    Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

    Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

    Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

    Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."  Martinez, 64 F.3d at 174.

B.    Factual Background

Plaintiff testified that she was 51 years old and had completed tenth grade.  She said she and her husband quit school in the eleventh grade to go to Texas where he had a job on an oil rig and get married.  She never got a GED.  She stated that she lives in Ponchatoula, Louisiana with her older brother, who does not work.  (Tr. 42-43).  She said that she is helping him because he was homeless in Atlanta and she could give him shelter, even though she has limited financial means.

Redwine testified that she is five feet four inches tall and weighs about 180 pounds.  She said this has been her weight for the past three years and that she gained weight after she began taking antidepressants.  She is right-handed.  (Tr. 43).

Plaintiff stated that she has no trouble using her right hand, but her left arm was in a sling at the hearing.  She explained that she received an eviction notice from her landlord two weeks earlier and she was two months late on her electric bill.  She said she

6

called her husband, who is living with another woman although he is still married to her, and asked him to help, but he said no.  She said she has nowhere else to go if she is evicted because she has no family in the area.  She testified that she was so upset after she hung up the phone that she felt dizzy, fell and fractured her left arm and three ribs. (Tr. 44-45).  She stated that she panics when she does not have a solution.  She said she used to be happy, friendly and good at dealing with the public.

Redwine testified that she borrowed money from a friend and drove herself to the hearing from Ponchatoula, which is about a 45-minute drive, without any trouble.  She said she has a valid driver's license.  (Tr. 45-46).  She stated that her friend usually drives her to see her psychiatrist, Dr. Michael Knight, and her friend would have driven her today, but her friend's house recently burned.

Plaintiff said that she is not working and that her last day at a "real job" was January 1, 2009.  She testified that she had tried other jobs since then, such as working as a gas station attendant in Albany, Louisiana.  She stated that she had four hours of training over two days and when she was left alone on the third day with 20 gas pumps, she got confused, all the pumps jammed up and customers were screaming at her, so she quit.  (Tr. 46).  She said she had tried working at a bakery making king cakes, but the employer told her after two days that she was not fast enough and he let her go.  She stated that she tried working at a dry cleaner and thought she would know how to do it because her first job was at a dry cleaner, but she could not do the job.

7

Redwine said she is afraid of people and does not want to talk to anyone. She testified that she used to be friendly, smiled all the time and had regular customers whom she knew and who liked her when she worked at the Piggly Wiggly. She said she feels like an outcast in her family because her husband gives money to their daughters all the time, but she does not have money to give them, so they only love their father. (Tr. 47-48). She stated that her youngest daughter, who lives in New Roads and has no children, did not invite her to a recent Fourth of July party.

Plaintiff clarified that she only worked at the dry cleaner for three days and that the employer told her she did not do things properly. As an example, she said that sometimes customers would tell her their last names first and she wrote down the customers' last names first, followed by their first names. She stated that the people hanging up the clothes then filed them in the wrong place because they filed them under the first names, which she thought was their fault, not hers. (Tr. 48). She said the employer told her to write the first names, then the last names, but she was trying to hurry when customers were waiting and did not remember to do it that way, so the employer got mad. (Tr. 48-49). She testified that she also got the sixes and eights mixed up when she was sorting clothes and could not file them correctly.

Redwine said she received some unemployment benefits during the prior year, but had not received any "since last June." She stated that she had worked at a grocery store called Bohning's for five months from August 2008 to January 2009 and never missed

a day of work.  (Tr. 49).  She testified that her employer accused her of something she did not do.  She said she had finished checking out a woman in a wheelchair, but the customer's check would not go through, so she called over the manager.  She stated that, while she waited, she talked with the next customer in line, whom she knew, and made a joking comment about that woman looking for something in her purse.  She testified that the woman in the wheelchair thought Redwine was making a derogatory comment about her.  Plaintiff said she was fired because she refused to apologize to the woman in the wheelchair when her manager told her to do so.  (Tr. 50-51).

Plaintiff stated that she was a cashier at Piggly Wiggly for a year or two before that.  She initially testified that she was let go from Piggly Wiggly because, after she had been there for one year, she asked to take vacation time during the Thanksgiving holiday when her daughter's baby was due.  She said she was told she could not take vacation during the holidays, but she knew that other people took time off during holidays.  (Tr. 51-52).  She clarified that she quit because she was angry.

Redwine said she worked before that job as a cashier at Springfield Cleaners.  Although the administrative record indicated that she became a manager, she stated that she was the only employee at a drop off and pick up location.  (Tr. 52).  She testified that she opened and closed the store, took in clothes, sent them out to be cleaned and dealt with customers, but she did not deposit money in the bank or supervise anyone.  (Tr. 53).  She said she worked 60 hours and six days per week there.  She stated that she quit after

9

the business was sold because the new owner would no longer pay workers for missed days and holidays, which the previous owner had done, and because the new manager threw things and cursed at the employees.  (Tr. 53-54).

Plaintiff testified that she worked as a presser for about five months "for Mr. Larry" at a dry cleaner but stopped doing it because it was hard work, she burned herself a lot and it was extremely hot during the summer.  She said she could not do the job because it scared her.  She confirmed that she also worked as a cashier at another dry cleaners called My Three Sons and at Fred's department store.

Redwine stated that she worked as a candy box wrapper on an assembly line at Elmer's candy factory for one and one-half years.  (Tr. 55-56).  She said she was let go from that job after the Valentine's Day rush was over and she never went back, although she thinks she could have gone back a few months later.  She did not return because she did not like the job and because she got the job at My Three Sons, where she worked until the owner sold the company.  (Tr. 56).

Redwine stated that she worked as head cashier at West Building Material when she was 28 years old.  She said she used to be a good cashier, was friendly and was able to get things done, but now she cannot do things.  She testified that she forgets what people told her five minutes earlier and she cannot concentrate on anything.  She said she used to do crossword puzzles and read books, but cannot do either anymore.  She stated that she can read a page three times, but would be unable to say what she had read.  She

said she watches television, but does not pay attention to it and could not explain what happened on the show. She testified that her attention span is gone. (Tr. 57).

Plaintiff testified that her problems began when her husband was sued before he left her. She stated that they lost two houses and all their vehicles, and that her daughter had to have her braces "ripped out of her mouth." She said they lost everything and could not afford to buy things for their older daughter during her junior and senior years at LSU. She stated that they only had one vehicle, which her husband used to go to his work in LaPlace, Louisiana, and that they had no insurance. She testified that she did not have any antidepressants for a year and did not leave the house, answer the phone or talk to anyone. She stated that her husband was living with her, but he would not come home at night except to get some clothes. She said he told her, after 33 years of marriage, that he did not want to be married anymore. (Tr. 58). She stated that she found out he was living with another woman one street away when she saw "two of his cars" at that other house the day before her birthday in 2009 and she confronted him at that house. (Tr. 59).

Redwine testified that in June 2009, after what "they said [was] my attempted suicide" in April, her husband told her she had 30 days to move out of their house because he had told the landlord they were moving out. She stated that he bought her a small, used, two-bedroom trailer. She said she did not have a job at that time. She testified that she fought the denial of unemployment benefits after being fired from Bohning's, won her appeal in July and began receiving benefits, so she could pay her

11

electricity and other bills.  (Tr. 60).  She stated that her husband had filed for divorce and had recently received the divorce decree, but she had not received it yet.  She said she is suing him for spousal support and insurance because her medications, including antidepressants, cost a lot of money.  She stated that he dropped her from his insurance after the divorce and he refuses to pay for her medications.  She testified that they have another court date in a month.  (Tr. 61).

Plaintiff said she cannot just stop taking her antidepressants "because after two or three days my head will go to spinning and then I'll really get crazy and really bad things and then I'll just totally lose it."  She stated that she has a government phone with only an hour of time on it and that she uses up half the time trying to call her husband, but he never answers until after about 20 calls and then refuses to help her with her medications.

The ALJ asked plaintiff about notations in her medical records that her physicians would no longer give her Lortab[2] because of her abuse of it, although plaintiff kept asking for it.  Redwine stated that she took Lortab as prescribed by her doctor for six years because of bad headaches.  (Tr. 62).  She said she now "live[s] off ibuprofen" and takes about 80 of them a week for her head because she has no choice.

Redwine testified that Dr. Hudspeth was her only doctor for 16 years.  She said she thought that he cared about her, but he showed that he did not when he took her off

---

[2]Lortab consists of hydrocodone bitartrate and acetaminophen.  Hydrocodone bitartrate is an opioid analgesic.  Acetaminophen is a non-opiate, non-salicylate analgesic.  Lortab is indicated for the relief of moderate to moderately severe pain.  RxList, http://www.rxlist.com/lortab-25-drug.htm (2013) (last visited May 14, 2013).

this medication and told her she could not have any more, despite her "screaming headaches." She stated that she had 17 cents to her name, no gas and no food, and she could not find Dr. Hudspeth, so she took sleeping pills so she could go to sleep and get rid of her headaches. She testified that she did not really try to kill herself, but she thought she might do so accidentally if she took too many pills, so she wrote a note just in case. She said she did not intend to kill herself. (Tr. 63).

When questioned about notes by Dr. Knight, her psychiatrist, that he also refused to prescribe narcotics, Redwine stated that she was not aware of that, knew only that Dr. Hudspeth would not give them to her, and denied that she had a problem. (Tr. 63-64). She said Dr. Knight prescribes Adderall[3] for her. She testified that she never took an overdose of any of her pills, but that she has bad headaches that will not go away and she tries to get rid of them.

Plaintiff stated that she tried marijuana once because a friend told her it would help her headaches and it did, but she does not use it anymore. She said she just tried it to see if it would work. She testified that Dr. Hudspeth had tried her on Imitrex, Lyrica and Celebrex, but she could not take any of them, and Lortab was the only thing that worked for her headaches. She said she took one every day when she woke up because the headaches do not go away if they ever start. She stated that the headaches are like

---

[3]Adderall (generic name: amphetamine salt combo) is a medicine used for the treatment of attention-deficit hyperactivity disorder. PDRhealth (PDR Network, LLC), http://www.pdrhealth.com/drugs/adderall (last visited May 14, 2013).

migraines and last for three days during which she cannot bear to see sunlight, hear any noise or do anything, and she just stays in bed.  (Tr. 64).

Redwine said that Dr. Hudspeth did not ask her how she was after "that attempted thing" and she felt hurt and angry that, although he had been her only doctor for 16 years, he did not care that she "was going through the headaches or anything like that."  She said that was why she did not go back to him.  She testified that Dr. Knight agreed with her and told her that Dr. Hudspeth should not have done what he did.  (Tr. 64-65).

Plaintiff said she is able to do her household chores, but does not do them every day.  She stated that her brother does the cooking because she does not like to cook.  (Tr. 65).  She testified that she only has one room air conditioner and that the temperature in the rest of the trailer gets up to 97 degrees, so she stays in the one air-conditioned room with her two dogs and watches television.  She stated that she cannot afford to go anywhere or do anything and that she has not been out of the parish or bought anything that she does not absolutely have to have in years.  She said she would prefer that her dogs have food rather than she, if it comes to that.  She stated that she gets food stamps and that two friends and her oldest daughter help her by buying things like dog food and toilet paper that she cannot buy with food stamps.  She testified that she does not have cable, telephone or trash pickup services, which have all been cut off because she cannot afford them.  (Tr. 66).

Redwine said she is uncomfortable around people, does not like to talk to anyone or have anyone ask her questions, and cannot make decisions for fear she will be wrong. She stated that she used to be organized and knew what she would have to do each day, but now she feels she has no control over anything because she never knows if she will have gas, a phone or food for her dogs.  She said she has had to go next door and beg for toilet paper, which is very embarrassing.  She does not like to talk to people because there is nothing good to say and she does not want to whine or cry in front of others.  She testified that she starts crying when she is upset and then she cannot breathe.  (Tr. 67-68). She stated that this happens at least once a week when she does not know what to do. She said her brother tells her she cannot just cry all the time, but she feels overwhelmed.

Plaintiff testified that her sleeping pills give her bad dreams, so she tries not to take them.  She said she takes Klonopin[4] before bed because it "kind of rest[s] my head." She stated that she has never been a good sleeper and that she wakes up to go to the bathroom four or five times a night.  She does not think she has "ever slept a whole night probably in my life."  Redwine said she does not have problems completing her chores because it is a small trailer and not difficult to keep up.  (Tr. 68).

---

[4]Klonopin (generic name: clonazepam) is a benzodiazepine indicated for the treatment of seizure disorders and panic disorder.  Physicians' Desk Reference 2855 (64th ed. 2010).

C.   <u>Vocational Expert Testimony</u>

Kasey Suggs, a vocational expert, testified that plaintiff's past relevant work as a cashier is classified as semiskilled work at the light exertional level.  She stated that Redwine's past relevant work as a janitorial services manager is medium, skilled work, while laundry attendant and candy packer are both medium, unskilled jobs.  (Tr. 69-70).

The ALJ posed a hypothetical of a person of plaintiff's age, education and past work experience who has no exertional limitations and can understand and carry out only simple repetitive instructions of an unskilled nature, but who should seldom have contact with the general public, can work in close proximity to but not in coordination with coworkers, <u>i.e.</u>, no team work, and should have low stress work, <u>i.e.</u>, no production work. Suggs testified that such an individual would not be able to perform plaintiff's past relevant work of candy packer and laundry presser, which involve production work.  She stated that the person could work as a dishwasher, maid or housekeeping cleaner, or pneumatic tube operator, all of which exist in significant numbers in the national and Louisiana economies.  (Tr. 70-71).  Suggs said the exertional level of the tube operator job is sedentary, while the other two jobs are light.

Suggs reviewed Exhibit 9F, which is Dr. Michael Knight's March 1, 2011 Mental Residual Functional Capacity assessment (Tr. 346-49).  The ALJ asked the vocational expert to assume that this exhibit is credible and supported by the medical record, and that the hypothetical person with Redwine's age, education and past work had the

16

limitations listed in the exhibit.  (Tr. 71-72).  Suggs testified that a person with the numerous marked impairments in many areas that would seriously affect her ability to function in a work setting would not be able to maintain gainful employment in the local or national economy.  (Tr. 72).  The ALJ asked whether any of the limitations alone would preclude all work.  Suggs stated that there were so many marked limitations in combination in so many areas, but that a marked limitation in the claimant's ability to complete a work task in a normal workday or workweek at a consistent pace alone could preclude her from being able to maintain employment over an extended period of time. (Tr. 72-73).

Plaintiff's attorney proposed a hypothetical of a person with the same limitations as in the ALJ's first hypothetical with the additional restrictions of [inaudible], only occasional ability to accept criticism and instruction from supervisors, occasional ability to work in proximity to a coworker without being distracted and occasional ability to sustain a regular routine without interruption from her [inaudible].  Suggs testified that the person would not be able to perform any of the jobs she had listed in response to the ALJ's first hypothetical, specifically because of not being able to perform work in a routine without interruptions throughout the work day.  (Tr. 73).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 24-29).  I find the ALJ's summary of the medical evidence

substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

    E.    <u>Plaintiff's Appeal</u>

        1.    The ALJ included in her residual functional capacity findings the limitations from the medical opinions to which she accorded <u>substantial weight.</u>

The ALJ found at step four of the sequential evaluation that Redwine has the residual functional capacity to perform the full range of light work at all exertional levels, with the following non-exertional limitations:   she can follow simple, repetitive instructions of unskilled nature; can seldom have contact with the general public; cannot engage in team work; and her assigned work must be low stress, <u>i.e.</u>, no production work. The ALJ assigned substantial weight to the opinions of an examining clinical psychologist, Sandra Durdin, Ph.D., and a non-examining, reviewing psychologist, Joseph Kahler, Ph.D.  Plaintiff argues that, despite this weight, the ALJ failed to include certain limitations from these opinions in her residual functional capacity findings.

At the request of the Commissioner, Dr. Durdin reviewed plaintiff's medical records and examined her on September 27, 2010.  Dr. Durdin opined that Redwine's abilities to understand, remember and carry out simple instructions and to maintain attention to perform simple repetitive tasks are mildly impaired, while she is moderately impaired in her abilities to sustain effort and persist at a normal pace over the course of

a 40-hour workweek; relate to others, including coworkers and supervisors; and tolerate the stress and pressure associated with day-to-day work activity.  (Tr. 331-32).

Dr. Kahler reviewed plaintiff's medical records on December 7, 2010 at the initial agency level.  He assessed her with mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two repeated episodes of decompensation of extended duration.  (Tr. 82).   As to specific limitations in Redwine's abilities to perform sustained work activities, Dr. Kahler opined that she was not significantly limited in several areas of sustained concentration and persistence and of social interaction, but was moderately limited in her abilities to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 83-84).  Dr. Kahler concluded that plaintiff was "capable of moderately complex work in a relatively low stress environment with few social demands."  (Tr. 84).

Redwine argues incorrectly that the ALJ accorded substantial weight to the medical opinions of Drs. Kahler and Durdin that included "marked" limitations. "Marked" in the context of limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace means "more than moderate, but less than extreme."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).  No such limitations appear in either Dr. Kahler's or Dr. Durdin's opinion.  The ALJ did not err by failing to include any marked limitations in her assessment of plaintiff's residual functional capacity.

Redwine also argues that the ALJ failed to incorporate in her residual functional capacity assessment the moderate limitations actually assessed by Drs. Kahler and Durdin.  This contention is not supported by the record.  The ALJ's findings that plaintiff can follow simple, repetitive instructions of unskilled nature; can seldom have contact with the general public; cannot engage in team work; and must be assigned to low stress work, i.e., no production work, substantially incorporate the moderate limitations assessed by the two psychologists, which the ALJ found credible.

Accordingly, this assignment of error lacks merit.

2.     The ALJ did not err by rejecting the findings of plaintiff's treating psychiatrist.

As discussed above, the ALJ assigned substantial weight to the opinions of Drs. Durdin and Kahler.  The ALJ assigned no weight to the March 1, 2011 Mental Residual Functional Capacity statement of Michael Knight, M.D., plaintiff's treating psychiatrist

20

at Ocshner Clinic Foundation. The statement is a preprinted form on which Dr. Knight checked boxes to indicate the degree of plaintiff's limitations in sixteen functional areas of social interaction, sustained concentration and persistence, and adaptation in a work setting. He found marked impairments in thirteen of the areas and moderate limitations in three, and opined that Redwine's condition was likely to deteriorate if she is placed under the stress of a job. (Tr. 346-49). The ALJ found that Dr. Knight's opinion "is not supported by the record including his own treatment notes." (Tr. 29).

Redwine argues that the ALJ did not comply with Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000), because she failed to give controlling weight to the opinion of plaintiff's treating psychiatrist and rejected it in favor of the opinions of two non-treating psychologists. Redwine asserts that the ALJ erroneously failed to explain her reasons for giving no weight to Dr. Knight's opinion and failed to address specifically the six factors set forth in Newton. Plaintiff contends that Dr. Knight's March 1, 2011 opinion is consistent with the record, including the opinions of Drs. Durdin and Kahler, and only differs from those opinions in the degree of limitation assigned. She further argues that the ALJ should not have assigned greater weight to the psychologists' opinions than to Dr. Knight's opinion because Drs. Durdin and Kahler did not have the benefit of reviewing Dr. Knight's treatment notes that were dated after their opinions and because Drs. Durdin and Kahler are neither medical doctors nor treating sources and, in Dr. Kahler's case, not even an examining source.

21

Plaintiff's last argument is unavailing.  Licensed medical or osteopathic doctors and licensed or certified psychologists are equally "acceptable medical sources," 20 C.F.R. § 404.1513(a), who can provide medical evidence to establish the existence of a medically determinable impairment, the severity of a claimant's impairment and how it affects her functional ability.  Patrick v. Astrue, No. 3:10cv371-DPJ-FKB, 2011 WL 3882818, at *3 (S.D. Miss. Aug. 15, 2011), report & recommendation adopted, 2011 WL 3881492 (S.D. Miss. Sept. 2, 2011) (citing SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006)); Patterson v. Astrue, No. 10-0600, 2011 WL 6157475, at *8 (W.D. La. Apr. 13, 2011) report & recommendation adopted, 2011 WL 2294807 (W.D. La. June 8, 2011) (citing 20 C.F.R. §§ 1527(a)(2), 416.927(a)(2)); Nickerson v. Astrue, No. 3-07-CV-0921-BD, 2009 WL 321298, at *6 (N.D. Tex. Feb. 6, 2009) (citing 20 C.F.R. §§ 404.1513(a), 416.913(a)).

In addition, "[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."   20 C.F.R. § 404.1527(f)(2)(i).  "Although ALJs 'are not bound by any findings made by State agency medical or psychological consultants,' they must consider such findings as opinion evidence."  Alejandro v. Barnhart, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003) (quoting 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i)); accord Butler v. Barnhart, 99 F. App'x

559, 560 (5th Cir. 2004) (citing 20 C.F.R. § 404.1527(f)(2)(i)).  Therefore, the ALJ

appropriately considered all of the medical opinion evidence.

As to plaintiff's arguments that the ALJ did not comply with <u>Newton</u>,

[t]he opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  A treating physician's opinion on the nature and severity of a patient's impairment will be given <u>controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.</u> . . .
. . . . [T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  <u>The treating physician's opinions are not conclusive.</u>  The opinions may be assigned little or no weight when good cause is shown.  <u>Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.</u>

<u>Newton</u>, 209 F.3d at 455-56 (quotations and citations omitted) (emphasis added).

The Fifth Circuit held in <u>Newton</u> that, before declining to give any weight to the

opinions of the claimant's treating specialist in the factual circumstances of that case, an

ALJ must consider each of the factors listed in 20 C.F.R. § 404.1527(d).  <u>Id.</u> at 456.

Those factors are:

(1) the physician's length of treatment of the claimant,
(2) the physician's frequency of examination,
(3) the nature and extent of the treatment relationship,
(4) the support of the physician's opinion afforded by the medical evidence of record,
(5) the consistency of the opinion with the record as a whole; and
(6) the specialization of the treating physician.

<u>Id.</u>

However, the Fifth Circuit "do[es] <u>not</u> require consideration of each of the factors set out in <u>Newton</u> where, as here, 'there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another.'" <u>Walker v. Barnhart</u>, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting <u>Newton</u>, 209 F.3d at 458) (emphasis added). Although "the ALJ must articulate the weight given to medical opinions, a recount of specific findings is <u>not</u> necessary if the ALJ shows he considered the medical findings." <u>Ciccotti v. Astrue</u>, No. SA-09-CV-969-XR, 2010 WL 3022775, at *11 (W.D. Tex. July 28, 2010) (citing <u>Thompson v. Astrue</u>, 232 F. App'x 421, 424 (5th Cir. 2007)) (emphasis added).

An ALJ may give less weight to the treating physician's opinions than to those of other medical experts, including non-treating experts, when the opinions are contradictory because "'[c]onflicts of evidence are for the Commissioner, not the courts, to resolve.'" <u>Byrd v. Comm'r of Social Sec.</u>, 368 F. App'x 542, 543 (5th Cir. 2010) (quoting <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005)); <u>accord</u> <u>Newton</u>, 209 F.3d at 452.

In the instant case, as she is obligated to do, the ALJ weighed conflicting medical opinions and resolved the conflict in favor of the opinions of Drs. Durdin and Kahler and Dr. Knight's treatment notes, rather than Dr. Knight's conclusory checklist opinion. "The ALJ properly explained [her] weighing of the opinions of the examining [physician] and the treating physician . . . . [She] was not required to attribute greater credibility to

24

[the treating physician]."  Escalante v. Astrue, 286 F. App'x 179, 180 (5th Cir. 2008) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)); see also Peck v. Barnhart, 214 F. App'x 730, 738 (10th Cir. 2006) (legitimate reasons existed to reject a doctor's opinion consisting "of checked boxes and circled numbers on a form" when the "opinion was not supported with additional explanation" and was not justified by the doctor's treatment notes); Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) ("the checklist format, generality, and incompleteness of the assessments limit their evidentiary value"); Johnson v. Apfel, 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's rejection of physician's check-box form when it was contradicted by evidence in the record).

The ALJ explained some of the inconsistencies in the record that supported her decision.  First, there is the direct conflict between the opinions of Drs. Durdin and Kahler that plaintiff has only mild to moderate limitations in her residual functional capacity to handle the mental requirements of work and the marked limitations noted on the form checklist by Dr. Knight.  Other inconsistencies mentioned by the ALJ that are substantially supported in the record include plaintiff's failure to comply with Dr. Knight's repeated recommendations that she seek individual psychotherapy, Dr. Durdin's opinion that Redwine was not taking her medications as prescribed or seeing a mental health professional consistently, the medical documentation of plaintiff's possible abuse of narcotic pain medication and actual use of marijuana, her allegation that she only used

marijuana once, her violation of the drug contract she had signed with Dr. Hudspeth, her denial of any knowledge that Dr. Hudspeth and Dr. Knight refused to prescribe narcotics for those reasons, her claim to Dr. Knight that she stopped seeing Dr. Hudspeth because he was too busy, the contemporaneous medical documentation of her suicide attempt, her subsequent repeated denials of any suicide attempt, the evidence regarding her situational stressors, the evidence of her activities of daily living and her receipt of unemployment benefits.

The record is clear that plaintiff did not stop working around her alleged onset date because of any medical impairment, but because she was fired from the grocery store. She received unemployment compensation for several quarters after she was fired and won her appeal.  However, "[a]pplications for unemployment and disability benefits are inherently inconsistent.  There is 'no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.'"  Workman v. Comm'r of Soc. Sec., 105 F. App'x 794, 801 (6th Cir. 2004) (quoting Bowden v. Comm'r, No. 97-1629, 1999 WL 98378, at *7 (6th Cir. Jan. 29, 1999)) (citing Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983)); accord Moore v. Astrue, No. 5:12-CV-00755-RDP, 2013 WL 1661435, at *7 (N.D. Ala. Apr. 11, 2013) (citing Workman, 105 F. App'x at 801-02; Schmidt v. Barnhart, 395 F.3d 737, 745 (7th Cir. 2005); Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991)).

Redwine emphasizes that Dr. Knight changed her diagnosis from <u>moderate</u> recurrent major depressive disorder in her visits to him in 2009 through August 24, 2010, records to which Drs. Durdin and Kahler had access, to <u>severe</u> recurrent major depressive disorder at her visits on December 16, 2010, February 10 and June 15, 2011. She argues that Dr. Knight's changed diagnosis and his treatment notes from these later visits, which the two psychologists did not review, support the marked limitations he assessed in his March 1, 2011 Mental Residual Functional Capacity report and that the ALJ's statement that this report was inconsistent with his treatment notes is not correct.

First, the "mere diagnosis of a mental impairment (such as depression) does not establish a claimant's disability claims." <u>Martin v. Chater</u>, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing <u>Anderson v. Sullivan</u>, 925 F.2d 220, 222 (7th Cir. 1991)); <u>accord</u> <u>Bordelon v. Astrue</u>, 281 F. App'x 418, 421 (5th Cir. 2008) (citing <u>Hames v. Heckler</u>, 707 F.2d 162, 165 (5th Cir. 1983)); <u>McLendon v. Barnhart</u>, 184 F. App'x 430, 431(5th Cir. 2006); <u>Harris v. Barnhart</u>, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); <u>Estok v. Apfel</u>, 152 F.3d 636, 640 (7th Cir. 1998); <u>Jones v. Sullivan</u>, 954 F.2d 125, 128 (3d Cir. 1991); <u>Arroyo v. Secretary of Health & Human Servs.</u>, 932 F.2d 82, 87-88 (1st Cir. 1991). Plaintiff "'must show that she was so <u>functionally impaired</u> by [her diagnosed impairment] that she was precluded from engaging in any substantial gainful activity.'" <u>Bordelon</u>, 281 F. App'x at 421 (quoting <u>Hames</u>, 707 F.2d at 165); <u>accord</u> <u>Anthony v. Sullivan</u>, 954 F.2d 289, 293 (5th Cir. 1992);

Hamauei v. Astrue, No. 10-85, 2011 WL 802398, at *7 (E.D. La. Feb. 28, 2011) (quoting Hames, 707 F.2d at 165).  Thus, the change in the severity of Redwine's diagnosis does not establish that she is so functionally impaired that she cannot work.

Second, plaintiff was denied DIB on December 7, 2010, which she reported to Dr. Knight on December 16.  She requested review of the decision by an ALJ on February 8, 2011, and she saw Dr. Knight two days later.  Dr. Knight's Mental Residual Functional Capacity report closely followed those events.  Substantial evidence supports the ALJ's statement that the multitudinous marked limitations he assessed are inconsistent with Dr. Knight's treatment notes.  For example, he consistently assigned plaintiff a score of 50 on the Global Assessment of Function Scale ("GAF"),[5] meaning that she has serious symptoms or serious impairment in social or occupational functioning.  This score never changed from her initial visit, when she was diagnosed with moderate major depressive disorder, through each subsequent visit, including those latest visits when her diagnosis

---

[5]     A GAF score represents a clinician's judgment of an individual's overall level of functioning.  See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning–e.g., 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for herself).  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range.  Lower GAF scores signify more serious symptoms.
George v. Barnhart, 458 F. Supp. 2d 314, 323 n.5 (S.D. Tex. 2006) (Botley, M.J.).  "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as inability to keep a job.  Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (Text Revision 4th ed. 2000)).

was changed to severe major depressive disorder.  Similarly, Dr. Knight's listing of Redwine's target symptoms, his assessment that her mental status was unchanged and his statement that she had made limited progress toward treatment goals never changed throughout every visit.  In circumstances such as these, "the ALJ may disregard the treating physician's opinions if 'he finds, with support in the record, that the physician is not credible and is leaning over backwards to support the application for disability benefits.'"  Thompson, 232 F. App'x at 424 (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)).

The ALJ also found Redwine not credible to the extent her subjective allegations were inconsistent with the residual functional capacity that the ALJ found.  The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'"  Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164).  Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court.  McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007).  The ALJ's explanation of her reasons for finding plaintiff not entirely credible is all that is required.  James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, No. 98-1680, 1999

WL 179476, at *9 (E.D. La. Mar. 31, 1999). The ALJ's credibility assessment extends to her consideration of plaintiff's self-reported symptoms and limitations to Dr. Knight.

The record therefore contains substantial evidence and good cause to support the ALJ's decision to assign no weight to Dr. Knight's March 1, 2011 opinion and to assign substantial weight to the opinions of Drs. Durdin and Kahler.

## CONCLUSION

The ALJ did not fail to include in her residual functional capacity findings the moderate limitations from the medical opinions of Drs. Durdin and Kahler to which she accorded substantial weight. The ALJ's rejection of the conclusory findings of plaintiff's treating psychiatrist is substantially supported by the record.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's motion for summary judgment be DENIED and her complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[6]

New Orleans, Louisiana, this ___20th___ day of May, 2013.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[6]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective
December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.